UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DINNER BELL MARKETS, INC., #233, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1:15-cv-00006-LJM-DKL |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| DEPARTMENT OF AGRICULTURE, ) | |
| ) | |
| Defendant. ) | |

**ORDER ON PLAINTIFF'S MOTION TO STAY
ENFORCEMENT OF AGENCY DECISION**

This case involves a decision by Defendant the U.S.A. Department of Agriculture (the "USDA"), that prohibits Plaintiff Dinner Bell Markets, Inc., #233 ("Dinner Bell") from participating in the Supplemental Nutrition Assistance Program ("SNAP") because the USDA concluded that Dinner Bell had engaged in trafficking of those benefits. Dinner Bell has moved to stay enforcement of the USDA's decision during the pendency of this law suit. For the reasons stated herein, the Court **DENIES** the Motion to Stay.

**I. BACKGROUND**

SNAP is designed to help people in eligible households obtain a more nutritious diet. 7 U.S.C. §§ 2011, 2013(a). Recipients of the benefit may only purchase food from approved retailers. *Id.* § 2013(a). The Food and Nutrition Service ("FNS"), an agency of the USDA, is responsible for running SNAP. 7 C.F.R. § 271.3(a). Under the civil penalty provision of SNAP, the agency may make decisions about violations of the statutes "on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an

electronic benefit transfer system." 28 U.S.C. § 2021(a)(2).  The same provision directs the agency to promulgate regulations that establish criteria for finding a violation of the statutes.  *Id.*  Under those regulations, "trafficking" in SNAP benefits is defined as "the buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits . . . for cash or consideration other than eligible food . . . ."  7 C.F.R. § 271.2.

On November 1, 1974, FNS approved Dinner Bell for participation in SNAP.  R. at 1.[1]  At the time of the initial approval, FNS classified Dinner Bell as a supermarket because more than 65% of the store's sales came from staple goods (meaning meat, dairy, fruit and vegetables, and bread or grains).  Hr'g, Skaer - Direct & Cross.  In 2011, FNS changed that classification to convenience store when the staples percentage of Dinner Bell's business dropped below 65%.  *Id.*  There are other classifications for businesses and an "other" category that includes businesses such as gas/grocery combination stores, military commissaries and others.  Hr'g, Skaer - Cross.

Since the advent of electronic transactions and subsequently Electronic Benefit Transfer or "EBT" for SNAP benefits, FNS has been using computer algorithms to look for patterns in EBT data that may indicate fraud or trafficking.  Hr'g, Skaer - Direct.  If a store is flagged, FNS does further analysis, including a store visit and human analysis of store data.  *Id.*

In or around April 2013, FNS' system flagged Dinner Bell's EBT redemption patterns as potential trafficking.  Hr'g, Skaer - Direct & Cross.  Specifically, the patterns

---

[1] The Administrative Record is filed at Docket No. 26, in multiple exhibits; however, the pages are sequential.  All citations to the Administrative Record in this Order will be formatted "R. at [page number]".  Facts illuminated at the hearing will be cited as "Hr'g, [Witness Surname - Direct/Cross/Redirect/Recross]" because the transcript is unavailable as of the date of this Order.

included: (1) using the same EBT card two or more times within 24 hours for transactions greater than $100.00; (2) individual accounts using 90% to 100% of their benefits in a single 24-hour period; and (3) excessive average EBT transactions for that store type. Hr'g, Skaer - Direct. *See also* R. at 78-80. With respect to the latter indicator, the average SNAP EBT transaction at a convenience store is approximately $6.00; the average SNAP EBT transaction at Dinner Bell was close to $20.00. Hr'g, Joyce – Direct & Cross; Skaer – Direct & Cross. For reference, the average SNAP EBT transaction at the "other" category stores is approximately $20.00. Hr'g, Skaer – Cross.

In light of those concerns, on July 18, 2013, FNS initiated a visit to Dinner Bell to obtain information for a review of the store's SNAP redemption patterns. R. at 13-27, 168-69. Subsequently, FNS monitored and analyzed Dinner Bell's SNAP transactions from April 2013 through September 2013. R. at 166. Based on that analysis, FNS determined that Dinner Bell's redemptions contained several patterns indicative of trafficking and sent Dinner Bell a charge letter dated July 25, 2014. R. at 78-80. Accompanying the charge letter was a report listing the transactions that FNS believed to be indicative of trafficking; there were approximately 1400 transactions. R. at 81-117. The charge letter further indicated that, under 7 C.F.R. § 278.6(e)(1), the sanction for trafficking was permanent disqualification and Dinner Bell had ten days to respond to the charge letter before FNS would issue a determination. R. at 78-79.

On August 7, 2014, the agency received a response from Dinner Bell in which it claimed that it had not engaged in trafficking. R. at 119-22. Specifically, Dinner Bell asserted that it was a high volume store on the densely populated southeast side of Indianapolis. R. at 120. It claimed that it built its business on low overhead, heavily

3

discounted items not found in traditional stores and that it has a "great array of SNAP eligible items" including milk, bread, juice, groceries, etc. R. at 120. Dinner Bell also stated that it carries additional eligible items including snacks, beverages, bulk groceries and candy. R. at 120. The store claimed that because of the heavy discounts on these items, they sell "a great deal of these products to SNAP beneficiaries . . . ." R. at 120. Dinner Bell reported that less than 5% of purchases at its store were made with SNAP benefits. R. at 120. In other words, SNAP "is a very small portion of [its] customers." R. at 120.

Further, Dinner Bell asserted that it had systems in place to ensure that it followed SNAP guidelines. R. at 121. Therefore, upon review of the items detailed in the agency's letter, Dinner Bell claimed that "many of the items . . . are exceptions to the vast amount of SNAP transactions." R. at 121. The following summarizes Dinner Bell's response to the agency's specific allegations:

1. Multiple transactions in unusually short periods of time

   Dinner Bell claimed that at least 63 times in the relevant period SNAP customers were inquiring about their balance, which would create a second transaction. R. at 121. In addition, SNAP customers are unsure of the cost of the items they want to purchase, therefore, a second transaction takes place once a total has been given on a subset of items. R. at 121. Dinner Bell noted that 294 transactions were declined during the relevant period. R. at 121.

2. The majority or all of individual recipient's benefits were exhausted in unusually short periods of time

   Dinner Bell cited data attached to its response that showed that 80 out of 7400 transactions in the relevant period evidenced this phenomenon. R. at 122. Dinner Bell admitted that it did not know how specific individuals used their benefits, but the average transaction was below $20.00. R. at 122. Dinner Bell reiterated that SNAP customers could buy large quantities of SNAP-approved products at a great discount at the store. R. at 122.

3. Excessively large purchase transactions were made from recipient accounts

4

Again, Dinner Bell reiterated that it sells approved items in large quantities at a discount and that the average purchase using SNAP benefits was less than $20.00 during the relevant period. R. at 122.

On October 6, 2014, the USDA analyzed Dinner Bell's response in an EBT Sanction Determination and found that the documentation provided could not explain several transactions. R. at 123-30. Specifically, the agency listed four specific households that had depleted their SNAP balance at Dinner Bell rather than spending any amount, or significantly lower amounts at a supermarket, which carries fresh meats and vegetables that Dinner Bell does not. R. at 124-27. The agency labeled this behavior very suspicious. R. at 124-27. Further, the agency cited the fact that redemptions for the 10 days prior to receipt of the charge letter were over $3,000.00 higher than the redemptions in the period 10 days after receipt of the charge letter. R. at 127. The 10 days after receipt of the charge letter occurred during the first two weeks of the next month. R. at 127. The typical redemption pattern is higher in the first two weeks of a month than the latter two; therefore, Dinner Bell's redemption pattern after receipt of the charge letter was the opposite, which the agency considered very suspicious. R at 127.

The agency further considered the available SNAP items at Dinner Bell and reiterated that the store carried no fresh meats or vegetables. R. at 129. The over $3,000.00 drop in SNAP transactions after the charge letter was also deemed very suspicious by itself. R. at 129.

Based on its review of Dinner Bell's response and the available data, the agency concluded: "It is more likely than not that the majority, if not all, of the transactions contained in our letter of charges were the result of trafficking and not the legitimate sale of food. A permanent disqualification is recommended." R. at 130.

5

On October 27, 2014, FNS issued a final determination letter in which it concluded that Dinner Bell had engaged in the trafficking of SNAP benefits. R. at 131-32.

On October 28, 2014, Dinner Bell submitted a timely request for review by FNS's Administrative Review Branch ("Review Branch"). R. at 134-40. It submitted additional documents for that review on November 11, 2014. R. at 144-60. Specifically, Dinner Bell reiterated its view that the USDA's analysis of the transactions of its store merely reflected the uniqueness of its business compared to traditional retailers and was not trafficking of benefits. R. at 144. It also provided evidence that trafficking could not occur at Dinner Bell; explained unusual transactions; and provided signed affidavits from the store manager, the night manager, the Chief Executive Officer and the Chief Financial Officer. R. at 144 (summarizing response).

With respect to proof that trafficking did not occur, Dinner Bell alleged that occasions of multiple transactions, exhaustion of benefits and large purchases did not evidence "trafficking." R. at 145. Dinner Bell asserted that the occasions of alleged trafficking were rare and did not break any USDA rules. R. at 145. The store further stated that there was no mechanism in place to "traffic;" rather, cashiers, assistant managers, managers, store accountant, corporate accounting and professional Certified Public Accountant review prevented any improper theft. R. at 145. Dinner Bell claimed that its corporate structure prevents trafficking from occurring as does its policies and procedures, where individual personnel are accountable and cannot issue money or other consideration without alerting a manager. R. at 145-46. Finally, Dinner Bell argued that its employees had no motivation to traffic since they had no access to proceeds of electronic benefits. R. at 146. Further, employees have a vested interest in following

SNAP guidelines because their employment and advancement are contingent on adherence to company policies.  Ra. at 146.  *See also* R. at 155-59 (employee affidavits describing procedures, policies and general practices).

With respect to unusual transactions, Dinner Bell reiterated that 5% of the sales at this "unique, very high volume store" came from SNAP benefits.  R. at 146.  Apparently Dinner Bell is unique because it allows customers to buy qualifying items in bulk, like candy bars, soda or chips in a bag.  R. at 146.  The store alleged that one SNAP customer might buy bread and milk; another bulk items.  R. at 146.  More specifically, with respect to multiple transactions in a short period, Dinner Bell explained that in 30 out of 38 identified occurrences, the second purchase was much smaller, which led Dinner Bell to conclude that the customer simply did not know how much was on their card or the customer forgot to purchase something and came back within a few days.  R. at 147.

With respect to the agency's evidence that the majority or all of a recipient's benefits were exhausted in an unusually short period of time, Dinner Bell stated that it had no idea whether anyone using SNAP benefits has exhausted them.  R. at 147.  In any event, the incidents cited by the agency occurred only 1% of the time.  R. at 147.  Dinner Bell discussed two specific transactions; Transaction #0136 showed a bulk purchase of an item that qualified for SNAP benefits; Transaction #0009 also showed a bulk purchase in large quantity of a qualified SNAP item.  R. at 147-48.

Dinner Bell explained that the allegedly excessively large purchase transactions were exceptions rather than the rule and that "the uniqueness and variety of items [the store] carr[ies] create [] rare large transactions."  R. at 148.  Dinner Bell provided a list of

bulk, SNAP approved items, and their corresponding prices, and asserted that it would be easy to make a large purchase of only a few items. R. at 148-49.

On December 2, 2014, the Administrative Review Officer issued a Final Agency Decision to uphold the permanent disqualification of Dinner Bell. R. at 163-75.

Dinner Bell filed its Complaint in this Court on January 2, 2015, seeking judicial review and a temporary stay of the Final Agency Decision. Dkt. No. 1. It formally moved for a stay on March 3, 2015. Dkt. No. 16.

On June 29 and 30, 2015, the Court held a hearing on the Motion to Stay. Dkt. Nos. 56 & 57. Testifying on behalf of Dinner Bell were Deron Quebe, owner and President; Karen Quebe Counts, owner and Chief Financial Officer; Cheryl Thomas, Ryan Zimmerman and David Lively, cashiers. Testifying on behalf of the USDA were Michael Skaer, Section Chief, USDA/FNS; and Vickie Joyce, CPA, Health Care Auditor for the U.S. Attorney's Office for the Southern District of Indiana.

Generally, Dinner Bell presented evidence that its store is not a convenience store, rather it is a unique, "mom and pop" retailer that sells bulk items at wholesale prices. Hr'g, Quebe – Direct. Many of these bulk items, including candy, snacks and soda pop, are SNAP approved items, which Dinner Bell sells at a deep discount. *Id.* Further, Dinner Bell has 7,000 square feet of retail space, which is much larger than a convenience store; the store also has a warehouse, owns a forklift and has an employee who is a forklift driver. *Id.*

Dinner Bell presented evidence that approximately 400 of the 1400 allegedly improper transactions are either duplicates or readily explained by receipts and normal purchasing patterns at the store. Hr'g, Counts – Direct; Thomas – Direct; Zimmerman –

8

Direct; Lively – Direct. The cashiers uniformly testified that it was not unusual for SNAP customers to make large transactions within a few minutes of each other because they did not know the balance on their account and would make a transaction to get their balance. Hr'g, Thomas – Direct; Zimmerman – Direct; Lively – Direct. In addition, the cashiers uniformly testified that they did not balance their own cash register drawers; this was performed by someone else, although none of them could identify who performed that duty. Hr'g, Thomas – Cross; Zimmerman – Cross; Lively – Cross. Although Counts testified that she received daily reports of sales and drawer balances, she did not perform that work herself. Hr'g, Counts – Cross.

Dinner Bell also presented testimony that SNAP customers were still coming to the store and were complaining that Dinner Bell was unable to accept SNAP benefits. Hr'g, Quebe – Direct; Thomas – Direct; Zimmerman – Direct; Lively – Direct. Quebe testified that the business had lost approximately 5 or 6% in sales because it could not accept SNAP benefits. Hr'g, Quebe – Direct. Dinner Bell presented no accounting records from 2014 or 2015 to corroborate this assertion. Further, no evidence was presented showing daily sales or drawer balances. There was also no evidence of contemporaneous inventory balances for the subject period.

The USDA presented evidence that approximately 5.38% of Dinner Bell's sales in 2013 came from SNAP benefits. Hr'g, Joyce – Direct. Based on the subset of legible receipts provided by Dinner Bell and reviewed by Joyce, USDA estimated that Dinner Bell's SNAP sales during the relevant period broke out into five major SNAP eligible categories as follows: Candy – 53.89%; Grocery – 23.67%; Beverages – 22.21%; Frozen Food – 0.13%; and Dairy – 0.10%. Hr'g, Joyce – Direct; Hr'g Ex. B-8.

## II. STANDARD ANALYSIS

The USDA argues that by statute and regulation, Dinner Bell is not entitled to seek a stay. However, Dinner Bell asserts that it is entitled to seek a stay pursuant to 7 U.S.C. § 2023(a)(17), which provides:

> During the pendency of such judicial review, or any appeal therefrom, the administrative action under review shall be and remain in full force and effect, unless on application to the court on not less than ten days' notice, and after hearing thereon and a consideration by the court of the applicant's likelihood of prevailing on the merits and of irreparable injury, the court temporarily stays such administrative action pending disposition of such trial or appeal.

Another provision in the same subsection provides: "Notwithstanding any other provision of this subsection, any permanent disqualification of a retail food store or wholesale food concern under paragraph (3) or (4) of section 2021(b) of this title shall be effective from the date of receipt of the notice of disqualification. . . ." 7 U.S.C. § 2023(a)(18).

FNS has interpreted paragraph 18 to prohibit the stay of any permanent disqualification that is based on a trafficking offense. Specifically, the regulation discussing judicial appeals states:

> During pendency of any judicial review, or any appeal therefrom, the administrative action under review shall remain in force unless the firm makes a timely application to the court and after hearing thereon, the court stays the administrative action after a showing that irreparable injury will occur absent a stay and that the firm is likely to prevail on the merits of the case. However, permanent disqualification actions taken in accordance with § 278.6(e)(1) of this chapter shall not be subject to such stay of administrative action. . . .

7 C.F.R. § 279.7(d). The agency contends that its interpretation of the interrelation of § 2023(a)(17) and § 2023(a)(18) is reasonable because of the proscription in § 2023(a)(18) of "[n]otwithstanding any other provision of this subsection" and the mandate that "any permanent disqualification . . . shall be effective from the date of receipt of the notice"

10

evidences that § 2023(a)(18) may override § 2023(a)(17)'s suggestion that a retailer may seek a stay. Dkt. No. 27, at 5-6. FNS also asserts that in 1996, when the Food Stamps Act was modified by the Work Opportunity Reconciliation Act of 1996, and § 2023(a)(18) was added, the legislative history suggests that Congress intended to use the provision "[t]o combat trafficking . . . ." Dkt. No. 27, at 7 (citing, *inter alia*, H.R. Rep. No. 104-651, 1996 WL 393655, at *69). Given this context, the agency argues that its interpretation of § 2023(a)(18) is inherently reasonable and that 7 C.F.R. § 279.7(d) is not an arbitrary or capricious construction of the statute; therefore, it is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resource Defense Counsel, Inc.*, 467 U.S. 837 (1984). Dkt. No. 27, at 7-8.

In contrast, relying on *Lazaro v. USDA*, 186 F. Supp. 2d 1203 (M.D. Fla. 2001), Dinner Bell contends that § 2023(a)(18) addresses only the effective date of a permanent disqualification based on trafficking, not the ability of a retailer to apply for a stay. Dkt. No. 32 at 1-2. Further, Dinner Bell argues that the right to seek a stay is unequivocally granted by § 2023(a)(17); therefore, it is illogical to interpret § 2023(a)(18) as a limit on the remedy when paragraph 17 never mentions the word "stay." Dkt. No. 32 at 2-3. Moreover, Dinner Bell asserts that even if the Court considers the statutory provisions ambiguous, under the second prong of the *Chevron* analysis the Court should conclude that the agency's construction is unreasonable. Dkt. No. 32 at 3-4.

Under *Chevron*, "[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." *Chevron*, 467 U.S. at 842. The Court must first determine whether or not "Congress has directly spoken to the precise question at issue." *Id. See also Gray v. United States*, 723 F.3d 795, 800 (7th Cir. 2013).

11

If Congress' intent is clear, the Court need inquire no more. *Chevron*, 467 U.S. at 842-43. In the absence of an answer or if the statute provides an ambiguous answer, then the Court must determine whether or not the agency's interpretation is based on a permissible construction of the statute. *See id.* at 843; *Gray*, 723 F.3d at 800.

The Court concludes that § 2023(a)(17) and § 2023(a)(18) can be construed harmoniously without affecting the right of a retailer accused of trafficking to seek a stay; the agency's interpretation is unreasonable. The unambiguous language of § 2023(a)(17) does not limit the circumstances under which or otherwise qualify the type of offense for which a retailer may seek a stay. In other words there is no limit on the right according to the plain language of the statute.

Section 2023(a)(18), does use the preamble, "Notwithstanding any other provision of this subsection . . .," however, even in light of the legislative history, most reasonably it is a reference to § 2023(a)(5). As the *Lazaro* court explained, paragraph 5 sets the effective date for the penalty associated with a final notice of determination. *Lazaro*, 186 F. Supp. 2d at 1210. On its face, it unambiguously applies to any final notice of determination, until you read § 2023(a)(18), which specifically makes "any permanent disqualification" of a retailer for trafficking "effective from the date of receipt of the notice of disqualification . . . ." 7 U.S.C. § 2023(a)(18). In other words, § 2023(a)(18) is an exception to § 2023(a)(5). This interpretation is the one most harmonious with the legislative history discussed by the USDA, which essentially tracks the language of § 2023(a)(18). Further, there is no mention of the right to a stay in § 2923(a)(18); rather the only thing it mentions is the effective date of a notice of disqualification. The most

reasonable interpretation is that the "notwithstanding" phrase refers to other parts of the subsection that relate to an effective date and not to any other paragraph.

For these reasons, the Court concludes that even if the statute is ambiguous, which the Court believes it is not, the agency's interpretation is not reasonable and cannot stand; therefore, the Court will address the merits of Dinner Bell's Motion to Stay.

### III. **MOTION FOR STAY**

Pursuant to the statutory scheme, the Court may issue a stay after "consideration . . . of the applicant's likelihood of prevailing on the merits and of irreparable injury . . . ." The Court must review the factual determinations of the USDA *de novo*. *See Estremera v. United States*, 442 F.3d 580, 585 (7th Cir. 2006) (affirming lower court's *de novo* review of agency's factual determinations); *Carlson v. United States*, 879 F.2d 261, 263 (7th Cir. 1989). However, "the 'penalty imposed by the FNS for violations of the Food Stamp Program may be set aside only if it's arbitrary and capricious.'" *Estremera*, 442 F.3d at 585 (quoting *Brooks v. United States*, 64 F.3d 251, 256 (7th Cir. 1995)).

On the merits, Dinner Bell bears the burden to show by a preponderance of the evidence that the agency's determination was invalid. *See Fells v. United States of Am.*, 627 F.3d 1250, 1253-54 (7th Cir. 2010). After reviewing the evidence presented in the briefs and the evidence at the hearing, the Court concludes that Dinner Bell may have some likelihood of success on the merits because its evidence that FNS has erroneously categorized it as a convenience store is compelling. This categorization led to at least one if not two of the reasons that Dinner Bell came under suspicion in the first instance. But, although Dinner Bell provided evidence that approximately 400 of the approximately 1400 questionable transactions could be explained through receipts, it left unexplained

nearly 70% of the transactions. Further, there is no evidence of daily cash drawer balances or inventory checks to corroborate any of the receipts. Because the relevant statute allows for disqualification upon a finding of only one incident of trafficking, *see* 7 U.S.C. § 2021(b)(3), Dinner Bell's evidence, while raising questions about the validity of some of the USDA's charges, falls short of the required showing of a likelihood of success on the merits at this stage of the litigation.

Further, the Court concludes that Dinner Bell has failed to evidence that the harm it will suffer because of FNS' enforcement action is irreparable. Although Dinner Bell argued otherwise, this Court concludes that irreparable harm is more than monetary loss; there must be more than a speculative chance of other irreparable injury. *See Gurtzweiler v. United States*, 601 F. Supp. 883, 885 (N.D. Ohio. 1985); *see also Khalik v. U.S. Dept. of Ag.*, No. 94 C 5809; 1994 WL 548213 at *2 (N.D. Ill. Oct. 5, 1994) (agreeing that, in a disqualification case, "if a showing of mere economic loss was sufficient to establish irreparable injury, issuance of a stay would be automatic"). Some courts have considered a substantial loss in sales enough to show irreparable harm, often 30% or more. *See Morgan v. Ragan*, 46 F. Supp. 3d 52, 63 (D.D.C. 2014); *Phany Poeng v. United States*, 167 F. Supp. 2d 1136, 1143 (S.D. Cal. 2001) (collecting cases and citing, *inter alia*, *Kim v. United States*, 822 F. Supp. 107, 110 (E.D.N.Y. 1993) (concluding that 30% loss of receipts and closing of the store was irreparable harm); *Ibrahim v. United States*, 650 F. Supp. 163, 165-66 (N.D.N.Y.) (concluding that loss of 30% of income and potential loss of business to be irreparable), *aff'd* 834 F.2d 52 (2d Cir. 1987)). But, Dinner Bell has not evidenced that its SNAP sales are even close to 30% of its sales or that the loss of such revenue in subsequent months has significantly impacted its bottom line at all. In fact,

Dinner Bell admits that less than 5% of its sales during the relevant period came from SNAP sales. R. at 146. *See also* Dkt. No. 1, Compl. ¶¶ 25, 27 (stating that Dinner Bell's sales in its fiscal year 2013 exceeded $5,000,000.00 and SNAP sales totaled $160,000.00, or only 2.62% of sales).

Further, Dinner Bell alleges that publication of its disqualification will result in the loss of goodwill within the community and that it will lose customers to competitors. Dkt. No. 24 at 15; Dkt. No. 32 at 14-15 (and evidence cited therein). However, Dinner Bell has provided no evidence that its sales have decreased dramatically because of the FNS action against it. In addition, according to Quebe, there are no stores in the surrounding area, and possibly in all of Indiana, that offer the kind and variety of bulk items available at Dinner Bell; Dinner Bell is unique by design. Hr'g, Quebe – Direct. Therefore, the store's claim that it will lose business to competitors is somewhat disingenuous, but is also unsupported by any evidence. Moreover, SNAP beneficiaries are still coming to the store because all of the cashiers testified that they have fielded questions about the store's inability to accept SNAP benefits. Hr'g, Thomas – Direct; Zimmerman – Direct; Lively – Direct. There was no testimony, however, that the SNAP customers left without buying anything and no financial data to show a drop in sales in any amount. Coupled with the small percentage of SNAP sales that Dinner Bell enjoyed historically, this absence of evidence of substantial harm defeats its allegation that any harm it suffered is irreparable.

## IV.  CONCLUSION

For the reasons stated herein, the Court **DENIES** Plaintiff Dinner Bell Markets, Inc., #233's Motion for Stay, Dkt. No. 16.

IT IS SO ORDERED this 2d day of July, 2015.

                                                  _____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Gary P. Goodin
GOODIN ORZESKE & BLACKWELL, P.C
ggoodin@goblaw.com

John D. Meyer
GOODIN ORZESKE & BLACKWELL, P.C
jmeyer@goblaw.com

Gina M. Shields
UNITED STATES ATTORNEY'S OFFICE
Gina.Shields@usdoj.gov

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov